# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

FILED
AUG 13 2008
AUG 13, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

ANTHONY TIMBERLAKE, a/k/a "G-Fats"

CRIMINAL COMPLAINT

CASE NUMBER:

08 CR 644

UNDER SEAL

MAGISTRATE JUDGE MASON

I, Jeffrey Moore, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

On or about June 9, 2008, at Chicago, in the Northern District of Illinois, the defendant,

ANTHONY TIMBERLAKE, a/k/a "G-Fats,"

did knowingly and intentionally distribute a controlled substances, namely, more than 50 grams of mixtures and substances containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance, and an amount of mixtures and substances containing heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

I further state that I am a Special Agent of the Federal Bureau of Investigation ("FBI") and that this complaint is based upon the following facts:

See Attached Affidavit.

Continued on the attached sheet and made a part hereof:　__X__ Yes　　____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

August 13, 2008　　　　　　　　　　　　　　　at　　Chicago, Illinois
Date　　　　　　　　　　　　　　　　　　　　　　　　City and State

MICHAEL T. MASON　　　　　　　　　　　　　　_____
United States Magistrate Judge　　　　　　　　　Signature of Judicial Officer
Name & Title of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jeffrey Moore, being duly sworn, state as follows:

### My Background and Experience

1.  I am a Special Agent of the Federal Bureau of Investigation ("FBI"), United States Department of Justice. I have been so employed for over five and a half years. I have participated in investigations involving drug trafficking activities for more than five years. In connection with my official FBI duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841(a)(1) and 846. I have also been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses, informants and others who have knowledge of narcotics trafficking. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers.

2.  The following information is based upon (a) my personal observations and knowledge; (b) my participation in this investigation; (c) information that I have received from other federal law enforcement officers; (d) information that I have received from officers with the Chicago Police Department ("CPD"); (e) my experience and training; (f) the training and experience of other law enforcement officers; (g) information provided to law enforcement officers by a cooperating witness ("CW"); (h) consensually recorded conversations; and (i) criminal history records maintained by the CPD and the National Criminal Information Center ("NCIC"). To the extent that recorded conversations are summarized below, those summaries do not include references to all of the topics covered during the course of the conversation that was recorded. In addition, the

1

summaries do not include references to all statements made by the speakers in the topics that are described.

3. This Affidavit is made for the limited purpose of establishing probable cause to support a criminal complaint charging ANTHONY TIMBERLAKE, a/k/a "G-Fats" ("TIMBERLAKE"), with the offense of knowingly and intentionally distributing and possessing with intent to distribute a controlled substance, namely, 50 grams or more of mixtures and substances containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance, and an amount of mixtures and substances containing heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

4. In particular, as further set forth below, a Cooperating Witness ("CW") working with the FBI successfully completed a purchase of cocaine base in the form of crack cocaine and heroin from TIMBERLAKE on or about June 9, 2008.

5. Based upon the information set forth below, there is probable cause to believe that TIMBERLAKE has violated 21 U.S.C. § 841(a)(1). As this Affidavit is for the limited purpose of establishing probable cause to support the foregoing criminal complaint, it contains only a summary of relevant facts, I have not included each and every fact known to me concerning the individuals and events described in this Affidavit.

## Facts Establishing Probable Cause

6. The FBI is currently conducting an investigation on members of the Ghost Town faction of the Black P Stone Nation ("BPSN") street gang. Ghost Town is an area of Chicago, Illinois, located in the vicinity of 68th Street and Winchester Avenue. The Ghost Town faction of

the BPSN is hereinafter referred to as Ghost Town BPSN. I have personally participated in the investigation since approximately March 2008.

7. During the course of the investigation, a Cooperating Witness ("CW1") has supplied narcotics trafficking information concerning TIMBERLAKE.[1] CW1 is a member of the Ghost Town BPSN street gang. CW1 has proven to be reliable and a substantial portion of the information provided by CW1 has been corroborated by independent investigation, including physical surveillance and CW1's participation in several consensually recorded telephone conversations. CW1 has provided information on ranking members of the Ghost Town BPSN who control the distribution of cocaine, crack cocaine, heroin, and marijuana in the Ghost Town area.

8. CW1 advised that TIMBERLAKE, also known as (a/k/a) "G-Fats," and other ranking Ghost Town BPSN gang members control the distribution of cocaine and crack cocaine in the Ghost Town area. From his involvement in Ghost Town BPSN, CW1 is aware that TIMBERLAKE holds

---

[1] CW1 has agreed to cooperate with the FBI in exchange for monetary compensation for services provided and reimbursement of expenses. To date, CW1 has been paid $7,444.46. CW1 has twenty-eight total arrests including, three arrests for Possession of a Firearm, three arrests for Aggravated Assault, two arrests for Assault, two arrests for Battery, two arrests for Delivery or Manufacture of a Controlled Substance, five arrests for Possession of Cannabis, two arrests for Possession of a Controlled Substance, three arrests for Disorderly Conduct, one arrest for Aggravated Battery, Criminal Trespass to a Vehicle, Theft, Domestic Battery, Operating a Car without a License and violation of parole. Defendant has at least 6 convictions for (1) Domestic Battery, (2) Possession with Intent to Sell a Controlled Substance, (3) Assault, (4) Aggravated Discharge of a Firearm, (5) Manufacture/Delivery of Cannabis, and (6) Possession of a Firearm. During the controlled purchase of narcotics described herein, a review of the audio/video recording of the controlled purchase revealed that CW1 attempted to keep a portion of the buy money and narcotics for himself/herself. After being confronted by law enforcement agents, CW1 admitted to attempting to keep money and narcotics from the agents. CW1 turned over to agents the money he/she kept during the transaction at a later date. Additionally, during another controlled purchase not described herein, despite being admonished by law enforcement agents regarding criminal activity, CW1 discussed smoking marijuana at a later time. On July 20, 2008, CW1 was arrested on a probation violation for failing to report. As a result, CW1's probation was extended an additional year.

the rank of general in the BPSN gang. According to CW1, he has observed TIMBERLAKE storing and selling crack cocaine and other drugs in and from his vehicle, a 2001 Crown Victoria bearing Illinois temporary license 745J801.[2] Through conversations with TIMBERLAKE and personal observation, CW1 knows that TIMBERLAKE generally distributes crack cocaine and other drugs on a block at 69th Place between Damen and Hoyne Avenues. According to CW1, TIMBERLAKE utilizes his cellular telephone[3] to facilitate drug transactions and to maintain contact with other Ghost Town BPSN gang members. As discussed below, CW1 made a purchase of crack cocaine and heroin from TIMBERLAKE.

### Controlled Purchase of Crack Cocaine and Heroin on June 9, 2008

9.  On or about May 30, 2008, at approximately 11:09 a.m., under the direction of law enforcement officers, CW1 made a consensually recorded telephone call to TIMBERLAKE at (773) 503-1417 for the purpose of discussing the purchase of 63 grams of crack cocaine and 25 grams of heroin.[4] CW1 dialed the phone number (773) 503-1417 in the presence of law enforcement officers,

---

[2] A check of Illinois Secretary of State records indicated that temporary license 745J801 was registered to AMBER L. GREEN, 1650 Sunnyside Avenue, Chicago Heights, Illinois, 60411.

[3] Subscriber records reveal that TIMBERLAKE's telephone is a cellular telephone bearing the number (773) 503-1417, which is operated by U.S. Cellular and subscribed under the name ANTHONY JONES at 6749 South Justine Street, Chicago, Illinois.

[4] At various points in the Affidavit, I will offer my interpretations of certain recorded conversations/meetings in brackets and otherwise. My interpretations of these conversations are based on my knowledge of the investigation to date and review of other interceptions, the contents and context of conversations, prior and subsequent conversations, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations generally. Moreover, the voice identifications for the conversations set out below are preliminary. The identification of some individuals involved in these conversations and meetings has not yet been completed. Some of these summaries do not include references to all the topics covered during the course of the conversations. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. For these recordings, I have relied on draft-not final-transcripts of conversations.

who confirmed the number was (773) 503-1417. During the call, TIMBERLAKE and CW1 agreed on the quantity of crack cocaine and heroin to be purchased and the price. CW1 first asked TIMBERLAKE, "What's the number you gonna put out for a 100 [meaning the price for 100 grams of heroin]?" TIMBERLAKE told CW1 that "I gotta have the whole 100 [TIMBERLAKE wanted $100 per gram of heroin]." CW1 then attempted to negotiate the price for the heroin, but TIMBERLAKE refused to lower his price. CW1 told TIMBERLAKE that s/he instead was interested in buying "a zip and a 63 [code for 25 grams of heroin and 63 grams of crack cocaine]." TIMBERLAKE told CW1 "we got the coke around and everything." CW1 asked TIMBERLAKE in part "what's the number gonna be for the 63? [referring to the price for 63 grams of cocaine]." TIMBERLAKE responded with "15 [TIMBERLAKE wanted $1,500 for 63 grams of crack cocaine]." CW1 then asked TIMBERLAKE in part, "then what for the zip on ah on the defense man [referring to the price of 25 grams of heroin]?" TIMBERLAKE responded with "24 (meaning $2,400 for 25 grams of heroin)." CW1 told TIMBERLAKE that s/he would call TIMBERLAKE back.

10. On or about May 30, 2008, under the direction and control of law enforcement, CW1 made a consensually recorded phone call during which CW1 again called TIMBERLAKE at (773) 503-1417. During the call, CW1 told TIMBERLAKE that s/he wanted to buy "a 63 and a zip." Later during the call, TIMBERLAKE asked CW1, "So, when do you want me to have it ready?" CW1 told TIMBERLAKE that s/he would be around on Tuesday.

11. On or about June 9, 2008, under the direction and control of law enforcement officers, CW1 placed a consensually recorded call to TIMBERLAKE at (773) 503-1417. During the call, CW1 asked TIMBERLAKE, "You ready boy [meaning if TIMBERLAKE was ready to sell CW1

the 63 grams of crack cocaine and 25 grams of heroin referenced in the May 30, 2008, telephone calls]?" TIMBERLAKE told CW1 "Yeah." CW1 later asked TIMBERLAKE, "Them numbers still the same, right [the prices for the crack cocaine and heroin were still the same]?" There was no response and the call was disconnected.

12. Prior to CW1's meeting with TIMBERLAKE on or about June 9, 2008, law enforcement agents searched CW1 for the presence of weapons, drugs or excessive money, none of which were found. An agent provided CW1 with $4,000 in funds to purchase 63 grams of crack cocaine and 25 grams of heroin. CW1 was equipped with a concealed audio/video recorder and a transmitter that allowed law enforcement officers to monitor CW1's conversations in real time. At approximately 11:51 a.m., the concealed audio/video recorder and transmitter were activated and CW1 was transported to the area of 69th Place and Damen Avenue in Chicago, Illinois, by an undercover law enforcement officer in an undercover vehicle. CW1 was kept under surveillance by law enforcement while traveling to the predetermined meeting location and for most of the meeting with TIMBERLAKE.

13. A review of the audio and video recording taken on that date, as well as a debriefing of CW1 revealed the following:

14. CW1 called TIMBERLAKE on (773) 503-1417, who told CW1 that he was on his way to the block. After several minutes, TIMBERLAKE arrived in a car bearing Illinois license plate number 745J801 and talked with CW1 about the status of the crack cocaine and heroin. According to CW1, TIMBERLAKE and INDIVIDUAL A,[5] approached CW1 on West 69th Place.

---

[5] CW1 knows INDIVIDUAL A from CW1's involvement in the BPSN gang, as well as from a previous controlled purchase of controlled substances. INDIVIDUAL A is also a member of the Ghost Town BPSN.

INDIVIDUAL A advised CW1, "I got 20 (inaudible), he got 5 of his own [meaning that INDIVIDUAL A had 20 grams of heroin and TIMBERLAKE had 5 grams of heroin]." CW1 told TIMBERLAKE and INDIVIDUAL A, "I only got 24 to spend [meaning $2,400]." TIMBERLAKE responded to CW1 in part "Okay, that's gonna, we only got 23 grams [meaning 23 grams of heroin]." INDIVIDUAL A then asked CW1 in part, "You roll with that?" CW1 answered "I'm gonna give you all the 24, give me the 23 grams [meaning that CW1 agreed to buy the 23 grams of heroin that TIMBERLAKE and INDIVIDUAL A had for $2,400]." A short time later, CW1 and INDIVIDUAL A walked to the backyard of a house belonging to a woman CW1 knows, through observation and previous interaction, to be INDIVIDUAL A's girlfriend.[6] CW1 advised that s/he counted out $2,400 for the heroin and INDIVIDUAL A took the money. After giving INDIVIDUAL A the money, CW1 advised that s/he returned to 69th Place to wait for the heroin.

15. After several minutes, TIMBERLAKE told CW1, face-to-face, in part "They got the soft, but I'm tryin' to get the cooked [meaning he did not have the crack cocaine, but he had cocaine]." CW1 advised TIMBERLAKE that he/she did not want to purchase powder cocaine. TIMBERLAKE asked CW1 in part "We finna to do it right now, can you stall while we cook it [meaning cook the cocaine into crack cocaine]?" CW1 agreed to wait for TIMBERLAKE to have the cocaine cooked into crack cocaine. CW1 advised that TIMBERLAKE had run toward a vehicle that was occupied by INDIVIDUAL B[7]. CW1 understood from TIMBERLAKES' statements and actions that INDIVIDUAL B had brought the cocaine and would take it to the residence located at

---

[6] CW1 later identified the residence as 2012 W. 69th Place, Chicago, Illinois, from a Cook County Assessor's Office photo.

[7] CW1 later identified the individual as INDIVIDUAL B from an Illinois Secretary of State photo.

2032 West 69th Place to cook it into crack cocaine. While waiting for the crack cocaine to be cooked, CW1, TIMBERLAKE, and INDIVIDUAL C drove in TIMBERLAKE's vehicle to a gas station located at 71st Street and Damen Avenue. While riding in TIMBERLAKE's vehicle and returning to the area of 69th Place and Damen Avenue, CW1 counted out $1,500 for the crack cocaine and handed it to TIMBERLAKE. TIMBERLAKE, CW1, and INDIVIDUAL C drove back to 69th Place and exited TIMBERLAKE's vehicle.

16. After several minutes, CW1 asked TIMBERLAKE and INDIVIDUAL A for the heroin and they walked together toward the backyard of 2012 West 69th Place. INDIVIDUAL A's girlfriend exited the residence and handed CW1 what s/he believed to be an amount of heroin. CW1 and TIMBERLAKE then walked toward the rear of the residence and TIMBERLAKE handed CW1 what s/he believed to be an additional amount of heroin to make the agreed upon 23 grams. TIMBERLAKE told CW1, in a recorded conversation, that his (TIMBERLAKE's) heroin was different from that supplied by INDIVIDUAL A and INDIVIDUAL A's girlfriend.

17. A short time later, TIMBERLAKE and CW1 walked again to the backyard of 2012 W. 69th Place. According to CW1, TIMBERLAKE motioned for CW1 to grab the crack cocaine from TIMBERLAKE's back pocket of his pants. CW1 took what was believed to be 63 grams of crack cocaine from TIMBERLAKE's back pocket. Following the meeting with TIMBERLAKE, CW1 was kept under surveillance by law enforcement and was transported back to a predetermined meeting location by an undercover law enforcement officer in an undercover vehicle.

18. At approximately 1:14 p.m., CW1 met with agents and the concealed recorder and transmitter were deactivated. Agents took possession of the suspected crack cocaine, suspected heroin, and funds not used in the transaction. Based on the physical characteristics of the substance

believed to be crack cocaine, including its texture and color, law enforcement agents believed that the substance tendered to them was cocaine base in the form of crack cocaine. Additionally, based on the physical characteristics of the substance believed to be heroin, including its texture and color, law enforcement agents believed that the substance tendered to them was heroin. Agents searched CW1 for additional contraband and money, none of which were found.

19. The suspect crack cocaine and suspect heroin were subsequently sent to the Drug Enforcement Administration ("DEA") Lab for analysis. The lab results indicated that the suspect crack cocaine was 35.1% cocaine base and weighed approximately 61.6 grams. The lab results indicated that the suspect heroin was 65.8% heroin hydrochloride and weighed approximately 21.9 grams.

### Conclusion

20. WHEREFORE, Affiant submits that the foregoing evidence establishes that defendant ANTHONY TIMBERLAKE, a/k/a "G-Fats," violated 21 U.S.C. § 841(a)(1), as charged in the foregoing Criminal Complaint.

JEFFREY MOORE, Special Agent
Federal Bureau of Investigation
United States Department of Justice

SUBSCRIBED AND SWORN TO BEFORE ME
this ___13th___ Day of August, 2008.

MICHAEL T. MASON
United States Magistrate Judge